UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SIMON E. KIRK,

                                    Plaintiff,

                vs.                                        08-CV-6016

NEW YORK STATE DEPARTMENT OF EDUCATION;          Hon. Charles J. Siragusa
RICHARD P. MILLS, Commissioner of Education;     United States District Judge
NEW YORK STATE BOARD OF REGENTS; and
ROBERT M. BENNETT, Chancellor of the
New York State Board of Regents,

                                    Defendants

_____


# DECLARATION OF MARGARET A. CATILLAZ
## IN SUPPORT OF APPLICATION BY PLAINTIFF SIMON E. KIRK FOR AN ALLOWANCE OF ATTORNEYS' FEES

MARGARET A. CATILLAZ, Esq., under penalty of perjury, states as follows:

1.   I am a member of Harter Secrest & Emery LLP, attorneys for plaintiff Simon E. Kirk.

I make this Declaration in support of a motion by the plaintiff for an allowance of attorneys' fees

in this matter, as permitted under 42 U.S.C. § 1988.

2.   On this motion, the plaintiff seeks a fee award for legal services rendered in

commencing this action and bringing it to the successful conclusion represented by the Court's

June 23, 2008 Decision and Order granting the relief demanded by the plaintiff in his Complaint.

In this Declaration, I will describe the services performed for the plaintiff in this action and

discuss the basis for the plaintiff's fee request.

3.   I was first approached by plaintiff Simon E. Kirk in connection with this matter in

May 2007.  Dr. Kirk, who was a practicing veterinarian here in Monroe County, sought my

- 2 -

advice in connection with his New York State license to practice veterinary medicine.  He feared that he would not be able to obtain a renewal of his license from the State Education Department after July 2008 because he was a Canadian citizen.  Dr. Kirk had obtained TN (Trade NAFTA) status from federal immigration authorities when he entered New York State in 2002, and he had renewed that status each year at the port of entry to the United States in Buffalo, New York.

4.   I understood that Dr. Kirk had consulted me because of my reputation as a practitioner of immigration law.  Indeed, because I have represented many foreign-born professionals in the course of my practice, I had long been aware of the various provisions in the New York Education Law that required different professionals, including veterinarians, pharmacists, physicians and dentists to be United States citizens or "permanent residents" in order to obtain permanent or unrestricted licenses to practice in New York State.

5.   I was aware, moreover, that these restrictions actively deterred many qualified foreign-born professionals from accepting positions in New York State, and that many experienced professionals have been forced to leave New York because they were not, under such provisions, able to obtain permanent licenses.  It had long been my view that these provisions, which appeared to discriminate against non-citizens and appeared inconsistent with provisions of NAFTA, were vulnerable to a constitutional challenge.

6.   I concluded that Dr. Kirk should, first, as a matter of prudence, file an application to become a "permanent resident" within the meaning of the federal immigration laws – that is, that he should commence the process to permit him to apply for what is commonly known as a "green card."  Accordingly, he retained me to assist him in connection with such an application.

- 3 -

With permanent resident status, Dr. Kirk would qualify for a permanent professional license under section 6704 of the New York Education Law.

7.   Understanding, however, that (a) the process of obtaining permanent resident status was lengthy and would probably not be concluded by July 2008 and (b) that the outcome of such an application was uncertain, I discussed with Dr. Kirk the possibility of an action challenging the citizenship requirements in the New York Education Law.  Given my view that the citizenship/permanent resident requirement was unconstitutional, I believed that such an application for permanent resident status represented an imposition on him.

8.   Initially, I asked my associate, Shaleeya McFadden, to research possible causes of action and to confirm my conclusions regarding the general state of the law pertaining to these citizenship requirements.  Then, in October 2007, I consulted with Paul Britton, a senior litigator with the firm, as to the feasibility of a lawsuit on Dr. Kirk's behalf challenging the constitutionality of section 6704.

9.   After reviewing the preliminary research that Ms. McFadden and I had assembled in the area of equal protection law, and after conducting further research of his own concerning a possible claim grounded not only on the Equal Protection Clause but also the Supremacy Clause (based on an apparent conflict with the citizenship requirements and provisions of NAFTA), Mr. Britton agreed with me that such a lawsuit would be well-founded.  Dr. Kirk authorized us to proceed.

10. After we addressed such threshold issues as whether to proceed in state court or in federal court, whether to commence suit in Rochester or Albany, and which constitutional issues to raise, Mr. Britton drafted, and we revised, in consultation with our client, a federal complaint

- 4 -

alleging claims under both the Equal Protection Clause and the Supremacy Clause.  Meanwhile, as our time records reflect, I was approached by attorneys representing other professional associations, such as pharmacists, who indicated that their clients might be interested in supporting Dr. Kirk's case as *amicus curiae*.  (Eventually an *amicus curiae* application was, indeed, filed in the action, but it came too late to be of assistance.)

11. In our Complaint, we took care to include particularized, accurate allegations concerning Dr. Kirk's immigration status, as well as his licensing status in New York State, because it was our intention to move for summary judgment in the action as soon as possible after issue was joined.  It was our hope that relief could be obtained before July 31, 2008, when Dr. Kirk's temporary license would expire.

12. We recognized that pursuing such a strategy was unusual and subject to unforeseen pitfalls, since a discovery phase is customary in nearly every federal action.  Our strategy was, however, ultimately successful, a result due in part to our efforts to avoid formal discovery, which was accomplished through cooperation with the defendants' counsel in providing him with additional background information relating to the plaintiff and licensing documents.

13.   After we filed the action in January 2008, counsel for the defendants advised me that he intended to seek a change of venue to the Northern District of New York, which would have materially increased the expense of prosecuting the matter for our client.  We began researching and preparing a response to such a motion even before it was filed, in order to minimize the delay resulting from the motion, which was filed in early February 2008.

14. The venue motion presented relatively novel issues under the Federal Rules relative to the jurisdiction in which events material to the litigation occurred.  It was argued and decided

on March 14, 2008; on March 24, 2008, the Court issued a Decision and Order denying the motion.  As a result of this determination, we filed an Amended Complaint.

15. While the venue motion was pending, we began preparing a summary judgment motion on Dr. Kirk's behalf, so that we could file it expeditiously (either in this Court or in the Northern District) as soon as the venue issue was resolved, bearing in mind that our client's temporary license to practice veterinary medicine was set to expire on July 31, 2008. Meanwhile, as already mentioned, I provided information and materials to the defendants' counsel in lieu of discovery.

16. We filed a motion for summary judgment on March 17, 2008 and, through consultations with the Court and opposing counsel, sought to bring it before the Court as soon as possible.  In their responding papers, the defendants agreed that summary judgment was appropriate and filed a corresponding cross-motion, to which we responded on May 16, 2008. The Court heard oral argument for June 19, 2008 and issued a Decision and Order in the plaintiff's favor on June 23, 2008.

17. I submit that the legal services in this action were performed efficiently and effectively.  Not surprisingly, my colleague Paul Britton initially had lesser familiarity with the nuances of immigration law and the applicable provisions of the Education Law, but he had extensive experience in the drafting of pleadings and motion papers in federal court, as well as in legal research and litigation strategy, together with a substantive familiarity with the venue and constitutional issues raised during the course of the action.  By the same token, although my early experience as a lawyer was in litigation, for many years my immigration practice has largely been conducted in other forums.  Our strengths were complementary, and I believe that

- 6 -

together Mr. Britton and I worked efficiently to devise and implement a strategy that would yield a timely result for our client.

18. In the exercise of billing judgment as required by applicable case-law, we have reviewed our time records in this matter and made a determination of the number of hours productively spent on this litigation.  We have determined the legal services which are and are not appropriate for inclusion in an application to the Court for legal fees.  The resulting time summary detailing the legal services performed by our office (including the lawyers and the paralegal) that are the basis for this application are annexed hereto as Exhibit 1.  Each item in this summary is based on contemporaneous time entries by Firm legal staff, in accordance with the practice and policy of our Firm.

19. I served as lead counsel in this matter.  My background may be summarized as follows:  I received a Bachelor of Arts degree from SUNY Albany in 1972 and obtained my law degree from Rutgers University in 1976, after which I accepted a position with the Rochester, New York law firm of Harter, Secrest & Emery.  Initially, my practice involved civil litigation of various kinds in state and federal court, but within several years, I began to concentrate my practice exclusively on federal immigration law, an area of law in which our Firm did not previously have expertise.

20. My practice, which now has national scope, includes counseling multinational corporations, educational institutions, hospitals and other health care facilities, as well as assisting smaller employers and individuals on immigration matters including permanent residence, labor certifications, temporary work visas, NAFTA issues, and employment eligibility verification requirements.

- 7 -

21. I have been the head of my firm's Immigration Group for over ten years.  I am a member of both the New York State and Monroe County Bar Associations.  For many years I have been actively involved with the American Immigration Lawyers Association ("AILA"), on whose Board of Governors I have sat since 1989.  I served as President of AILA in 2000-01.  I am also a member and former President of the International Business Council of the Rochester Business Alliance (formerly the Rochester Chamber of Commerce) and a former President of the Volunteer Legal Services Project.  After a peer review process, I have been named to "Best Lawyers in America", "Who's Who of International Business Lawyers." and the Chambers & Associates "America's Leading Lawyers for Business" for my work in immigration law.

22. I have been a frequent lecturer on immigration matters throughout the United States and abroad, including presentations at national and international conferences in New York, San Francisco, Los Angeles, San Diego, Houston, Miami, Orlando, Seattle, Washington, D.C., Atlanta, Las Vegas, Phoenix, Albuquerque, Denver, New Orleans, Minneapolis, Philadelphia, and Newark,  as well as Toronto, Vancouver, Montreal, Berlin, and London.  I have co-chaired the Immigration Law programs sponsored annually by the New York State Bar Association for over 5 years.  I am the author of a number of articles published in journals of AILA and the American Law Institute over the last twenty years, and I am the Editor-in Chief of *Immigration Options for Physicians*, 2nd Ed (2004), published by AILA and I am currently working as the Editor-in Chief on the 3rd edition of that publication.  I am on the Immigration Advisory Board of West (Thompson Reuters) Publishing Company and I am a contributing author to an upcoming publication of that company.

23. My customary hourly billing rate is currently $350, and during 2007 it was $325.

- 8 -

24. A. Paul Britton is a litigation attorney with extensive experience in business and appellate litigation in both state and federal court.  He is a 1975 graduate of Roberts Wesleyan College; he earned his law degree from the Syracuse University College of Law in 1978 and was admitted to practice in 1979.  He now has 30 years of experience as a litigator with Harter Secrest & Emery LLP.

25. Mr. Britton's customary hourly billing rate is currently $320; during 2007 it was $310.

26. To the extent possible, we assigned appropriate tasks on this file to firm paralegals. Christine Sellers has 25 years' experience as a litigation paralegal at our firm and has worked extensively on federal court matters.  Her customary hourly billing rate in 2008 is $125 per hour and during 2007, it was $120.

27.  Shaleeya McFadden is an associate who practices in the area of employment-based immigration law.  She is a 1995 graduate of Canisius College and earned her law degree, along with a MSW degree, from SUNY Buffalo in 2004.  Her customary hourly billing rate is currently $180 per hour and during 2007, it was $165.

28. Our Firm customarily bills the time of these legal personnel at the foregoing hourly rates.  The time necessarily and productively spent by our firm's legal staff (236.1total hours), as detailed in Exhibit A, multiplied by the applicable hourly rates for the legal staff performing the services (see paragraphs 22 through 25 above) yields total fees of $70,627.50 for services through June 30, 2008.

- 9 -

29. I submit that this figure of $70,627.50 should serve as the lodestar amount, or presumptively reasonable fee, in the Court's consideration of an appropriate allowance of attorneys' fees.

30. In addition, our firm incurred various out-of-pocket expenses in the course of prosecuting this action, including the Court's $350 filing fee, as well as fees for service of process, messenger delivery, postage, copying, and fax charges, all as shown on the summary at the end of Exhibit A.  All of these are charges that our Firm customarily, as a matter of practice and policy, charges to its clients.  These expenses totaled $674.94.  The plaintiff seeks an allowance of these expenses in addition to an allowance of attorneys' fees.

31. Finally, I respectfully ask that, under all the circumstances, the Court consider an upward adjustment of the presumptively reasonable fee.

32. First, our submissions and arguments were efficacious in assisting the Court with its analysis and resolution of the legal issues presented by this action.  We achieved a high degree of success in achieving the objectives of the action for our client.

33. Ultimately, each of our arguments on behalf of the plaintiff were accepted by the court: (a) that venue properly lay in the Western District of New York, (b) that the citizenship requirements under New York Education Law Section 6704 were subject to strict scrutiny analysis under the Equal Protection Clause, (c) that those requirements would not survive even a "rational basis" analysis under the Equal Protection Clause, and (d) that those requirements were not consistent with NAFTA and violated the Supremacy Clause.

34. Thus, the Court awarded all the relief requested in Dr. Kirk's Complaint, namely, a declaration that the citizenship requirements of section 6704 were unconstitutional, and an order

- 10 -

permanently enjoining the defendants from applying or enforcing those provisions in connection with an application by Dr. Kirk for a professional license as a veterinarian.

35. Second, we ask that the Court consider the risks of this litigation, weighed against the possibility that counsel might not be fully paid for services rendered.  In taking this case, Mr. Britton and I knew that we had good grounds for arguing that section 6704 was unconstitutional, but we had no assurance that the Court would agree.  The Circuit Courts of Appeal in the Fifth and Sixth Circuits had reached unfavorable conclusions within the last five years on the issue of whether discrimination against aliens was subject to strict scrutiny, giving rise to the possibility that this Court would agree with the reasoning of those courts; more favorable precedents from the Second Circuit were older.  The issues relating to the Supremacy Clause were, as a practical matter, of first impression.

36.  Third, we ask the Court to consider the difficulty and complexity of this matter.  In no sense was this a "cookie-cutter" civil rights action; the underlying facts, the governing law, and the constitutional arguments were unique.  The case required a sophisticated knowledge of federal immigration law both in theory and in practice.  It also required the ability of counsel to research, analyze, and synthesize a extensive body of equal protection law and to apply it to a case in which, uniquely, a state licensing statute appeared to discriminate against some, but not all, aliens.  To assist the Court, we prepared a 39-page Memorandum of Law in support of Dr. Kirk's motion for summary judgment, as well as an 8-page Reply Memorandum of Law. Moreover, since time was of the essence to Dr. Kirk, the case required a litigation strategy designed to yield a final determination in a short period of time.  From the filing of Dr. Kirk's

- 11 -

Complaint to the filing of the Court's Decision and Order granting summary judgment in his favor was a period of little over five months.

37.  Finally, we ask that the Court consider the extent to which an enhanced attorneys' fee award in this civil rights action would serve the Congressional policy of encouraging lawyers to undertake such litigation.  From my years of contacts with professionals in various disciplines who are not United States citizens, I know beyond question that a great number of highly qualified pharmacists, physicians, dentists, veterinarians, and others have either refrained from coming to New York in the first place, or have left New York after temporary licenses have expired, because of section 6704 and similar unconstitutional provisions in the New York Education Law.  I am also aware that there are economic and parochial factions in New York State that have an interest in deterring foreign-born professionals from practicing in New York, a factor that has surely deterred lawyers from undertaking such cases in the past.

38. The expense and risks of litigation have, I know, been significant deterrents for professionals who might have challenged these statutes under the federal civil rights laws. Congress intended, surely, that experienced, competent counsel have a financial incentive to undertake *bona fide* challenges to unconstitutional state laws.

39. For these reasons, I respectfully ask that the Court, in its discretion, consider adjusting the lodestar figure (the presumptively reasonable fee) of $70,627.50 upward by a percentage or figure that will appropriately reflect the degree of success of the action, the difficulty and complexity of the issues presented, the possibility of failure, the compensation risks, the quality of the work performed, and the desirability of encouraging competent counsel to undertake such cases.

- 12 -

40. I respectfully submit that the Court should make an allowance of attorneys' fees in such an enhanced amount, to which should be added an allowance of expenses in $674.94.


I declare under penalty of perjury that the foregoing is true and correct.


July 21, 2008                                              s/Margaret A. Catillaz____
                                                          Margaret A. Catillaz